**In the Matter of O'NEILL ENTERPRISES, INC.**

**No. 71–BK–130–C.**

United States District Court,
W. D. Virginia,
Charlottesville Division.

Sept. 28, 1973.

See, also, D.C., 359 F.Supp. 940.

George Gilliam, William Massie Smith, Paxson, Marshall & Smith, Charlottesville, Va., for Citizens Bank & Trust Co.

T. Munford Boyd, Paxson, Marshall & Smith, Charlottesville, Va., for Trustee in Bankruptcy.

Marc Jacobson, Norman Hecht, Norfolk, Va., for Industrial Security Corporation.

Gray Williams, Charlottesville, Va., Trustee of O'Neill Enterprises, Inc.

Edward H. Deets, Jr., Charlottesville, Va., for bankrupt.

Robert Musselman, Charlottesville, Va., for respondent.

## OPINION and ORDER

TURK, District Judge.

This case is before the court on petitions for review filed by Citizens Bank and Trust Company (hereafter referred to as "Citizens") and Industrial Security Corporation (hereafter referred to as "Industrial") from a decision and order entered on March 6, 1973 by the Referee in Bankruptcy. Jurisdiction in this court is pursuant to § 39(c) of the Bankruptcy Act, 11 U.S.C. § 67(c). This case arose out of the bankruptcy of O'Neill Enterprises, Inc. in January, 1972, and is concerned with the security interests of competing creditors of the bankrupt. Opposing the position asserted herein by Citizens and Industrial is a committee representing the holders of an issue of O'Neill bonds dated May 1, 1969.

The bondholders, who are involved in this controversy, became secured creditors of the bankrupt when certain property known as Lots 1, 2 and 3, University Acres was conveyed by a deed of trust dated May 1, 1969, to secure a debt of $300,000 evidenced by 300 "First Mortgage Real Estate Bonds" for $1,000 each. In this deed of trust, the appraised value of Lot 1 was fixed at $175,000, and the total appraised value of the three lots was stated as $365,951. The deed of trust provided for the release of Lots 1 and 3 as the value of the improvements that were anticipated to be erected on Lot 2 increased. The principal focus of the controversy in this case concerns the following clause from this deed of trust permitting the substitution of collateral.

"The Grantor shall also have the right of releasing either or both Lots Nos. 1 or 3 if there shall be provided as substitute security, a first lien on other real estate having an average appraised value of $175,000.00 for Lot No. 1 and $64,125.00 for Lot No. 3. For the purposes of reappraising Lot No. 2 or the appraising of property offered as substitute security, such values shall be the average appraised value as determined by appraisals of the National Bank & Trust Company and the Citizens Bank & Trust Company. The Grantor also shall be entitled to the release of either Lots Nos. 1 or 3 if there is deposited with the Trustees a Certificate of Deposit with any local bank in the amount equal to two-thirds (⅔) of the present appraised value (as set out above) of Lots Nos. 1 or 3, as the case may be. Upon compliance with this provision, either by deposit of Certificates of Deposit or the providing of appraisals and a valid first lien on other real estate as substitute security, the Trustees are hereby authorized, without further action by the bondholders, to enter into a release of the appropriate lot or lots."

In July of 1971, the bankrupt negotiated a mortgage loan from Citizens with Lot 1, University Acres as security. This required that Lot 1 be released from the above described deed of trust and that other property be substituted as provided in the substitution clause. Accordingly, by an instrument dated July 19, 1971 and recorded on July 30, 1971, the lien on Lots 1 and 3, University Acres was released and property known as Lots I, J, and K of The Cedars was substituted as collateral for the bondholders. Simultaneously, a deed of trust was executed and recorded conveying Lot 1, University Acres as collateral for a loan of $100,000 from Citizens to the bankrupt. At this time, Citizens was also given a six-month option to purchase Lot 1 for $150,000. As recorded on August 20, 1971, this option contained a restriction which prohibited any further encumbering of Lot 1 in excess of $40,000 above the lien held by Citizens.

On August 16, 1971, the bankrupt negotiated a loan of $100,000 from Indus-

trial and conveyed by deed of trust, recorded on that day, Lot 3, University Acres, along with additional collateral. By a deed of trust dated August 19, 1971, and recorded on August 20, 1971, Lot 1, University Acres was conveyed as additional security for the indebtedness to Industrial.[1] By its terms, this deed of trust stated that it constituted a second lien which was subordinate to the deed of trust dated July 30, 1971 from the bankrupt to Citizens.[2]

The substitution of collateral clause in the May 1, 1969 deed of trust, quoted *supra,* provided that the substituted security was to have an average appraised value of $175,000 for Lot 1 and $64,125 for Lot 3 and that such averages were to be derived from appraisals by National Bank and Trust Company and Citizens Bank and Trust Company. In July, 1969, Alvin Clements, Executive Vice-President of Citizens Bank and Trust Company, had appraised nine lots in The Cedars Subdivision including the following: Lot I at $106,875; Lot J at $84,375; and Lot K at $84,375. Thus the total appraised value of these lots was $275,625, but this appraisal contained the following addendum:

"These values are based on the assumption that Cedar Street will be improved to a width of 56 feet and accepted as part of the city street system.

William Bell, Vice-President at National Bank and Trust Company, had also appraised the same lots in July, 1969 for the bankrupt. He valued Lot I at $117,560, Lot J at $92,800 and Lot K at $92,800 making a total value of $303,160. His appraisal was not made subject to any assumptions. The average of these two appraisals was $289,392. At the

time of the bankruptcy proceeding in October, 1972, the estimated cost of improving the Cedars property to meet the condition in Mr. Clements' appraisal was $46,167.

In July, 1971, presumably in conjunction with the plan by the bankrupt to substitute Lots I, J and K of the Cedars for Lots 1 and 3 of University Acres, in accordance with the substitution clause, the president of the bankrupt inquired of Mr. Clements concerning the related values of these properties. His reply stated:

"In my opinion, the two pieces of property can be considered comparable in value; however while both properties are salable, the properties located on Ivy Road (Lots 1 and 3, University Acres) could likely be sold immediately, whereas the values of the properties on Cedar Court could best be realized through the expenditure of additional funds to develop the land for apartment use or as an extension of Barracks Road Shopping Center."

The controversy in this case was precipitated when the Trustee in Bankruptcy for O'Neill Enterprises, Inc. sought to sell Lot 1, University Acres to Citizens under the option agreement mentioned above. At the option price of $150,000, the $100,000 loan from Citizens would have been repaid, and the additional $50,000 would have been used to repay $40,000 of the $100,000 loan from Industrial (in accordance with the encumbrance limitation in the option) leaving $10,000 as surplus proceeds for the general estate.[3] In April, 1972, the Referee in Bankruptcy notified the bondholders, Citizens and Industrial of a show cause hearing concerning the exercise of the option and the proposed $100,000

---

1. This was in consideration of release of part of the loan fund withheld pending the furnishing of additional security.

2. This deed of trust also stated that it was subject to the provisions of the option held by Citizens and the prior debt owing to the holder of the option.

3. As the Referee noted in his opinion, the Trustee in Bankruptcy made no challenge to the security rights of Citizens, Industrial or the bondholders but did support the option rights of Citizens since the exercise of such option rights would realize $10,000 for the bankruptcy estate.

set-off by Citizens. A hearing was held in October, 1972 and in March, 1973, the opinion and order which Citizens and Industrial are now challenging in part was handed down.

The primary issue before the Referee concerned the priority of the liens on Lots 1 and 3 University Acres with a committee of the bondholders challenging the priority position asserted by Citizens and Industrial. The validity of the option held by Citizens and the sale of Lot 1, University Acres for $150,000 pursuant to that option was confirmed by the Referee and has not been made an issue before this court. The decision reached by the Referee in Bankruptcy held that although the substitution clause contained in the deed of trust of May 1, 1969 was not in and of itself invalid as a matter of law, there had not been lawful compliance with the provisions of the clause. Accordingly, the Referee decided that the bondholders were not bound by the substitution of collateral provision in the May 1, 1969 deed of trust, and the liens of Citizens and Industrial on Lots 1 and 3, University Acres, were subordinate to that of the bondholders. Consistent with this holding, Citizens was not allowed to set-off the $100,000 indebtedness of the bankrupt against its $150,000 purchase price. On the basis of the foregoing determinations, the Referee held that the $366,000 received from the sale of Lots 1, 2 and 3, University Acres was to be applied to the unpaid balance of $280,000 remaining on the May 1, 1969 bonds. This was to be accomplished by applying the entire sales proceeds from the sale of Lot 2, University Acres, to the bonds,[4] and applying the sales proceeds from Lots 1 and 3, University Acres toward the balance of the bond debt in the same percentage the proceeds from each lot bore to the sum of the sales proceeds for both lots.[5] The net balance from the sale of Lot 1, University Acres was ordered paid to Citizens and the net balance of Lot 3, University Acres was ordered paid to Industrial as the respective subordinate lienholders. Finally, the Referee's order subrogated Citizens and Industrial to the lien of the deed of trust for Lots I, J and K of The Cedars which had been the substituted security for the May 1, 1969 bonds.[6]

The initial question concerns the Referee's conclusion that there had not been lawful compliance with the substitution of collateral provision in the May 1, 1969 deed of trust. This clause provided for the release of Lots 1 and 3, University Acres "if there shall be provided as substitute security a first lien on other real estate having an average appraised value of $175,000 for Lot No. 1 and $64,125

4. The bonds were apparently the only debt secured by Lot 2, University Acres.

5. The Referee found that 64% of the balance of the bond debt was to be paid from the sales proceeds for Lot 1 and 36% of the bond debt was to be paid from the sales proceeds of Lot 3.

6. It is clear that under the Referee's order Citizens and Industrial would have been adequately secured since the estimated value of Lots I, J and K, The Cedars was well in excess of the bankrupt's indebtedness to these parties. The primary reason for the challenge to the Referee's order in this case by both Citizens and Industrial is their fear that they may be left without adequate security. Such a possibility might result from the fact that The Cedars property had originally been conveyed by deed of trust to secure a series of bonds dated August 1, 1969 in the original principal amount of $300,000; this deed of trust had also contained a provision for the substitution of collateral; and pursuant to this substitution clause; additional property had been substituted for Lots I, J and K; The Cedars, thus freeing this part of The Cedars of liens. Citizens and Industrial fear that the success of the May 1, 1969 bondholders in recovering their original collateral (as was ordered by the Referee) could spur the August 1, 1969 bondholders to replace their present collateral with the original collateral (Lots I, J, K of The Cedars), thus leaving the petitioners in this case substantially unsecured. Two other reasons for the challenge may be that The Cedars property is not as readily salable as is the University Acres property; and Citizens desired to set-off the indebtedness of the bankrupt against its option price which, of course, it could not do unless it had a valid first lien.

for Lot No. 3". As was stated previously, the average appraised value for Lots I, J and K of The Cedars was $289,392, but one of the two appraisals used in achieving this average was "based on the assumption that Cedar Court will be improved to a width of 56 feet and accepted as part of the city street system." This was expressed again in July, 1971 in the letter from Mr. Clements to the president of the bankrupt in which it was stated that although both properties were salable, "the values of the properties on Cedar Court could best be realized through the expenditure of additional funds . . ." The improvements in question were estimated below to cost $46,167, but if the $46,167 is subtracted from the $289,392, the average appraised value of The Cedars property is still $243,225 or more than $4,000 greater than the stated values of Lots 1 and 3 in the deed of trust.[7] Despite the strength of this arithmetic, the Referee was of the opinion that because one of the appraisals was based on certain assumptions, a requirement in the substitution clause was not met. But the appraisal which was found to be insufficient was not qualified or conditional as such; it merely estimated the value of Lots I, J and K of The Cedars based on the assumption that the road would be widened and made a part of the city street system. The appraiser apparently could have estimated the cost of making such improvements at the time of the appraisal and deducted the cost from his appraisal to arrive at the current net value for the property. Instead he merely appraised the property and added the assumption, but in either case the result was the same: the current net value of Lots I, J and K of The Cedars was readily ascertainable and easily satisfied the requirement that it be at least equal in value to the stated values of Lots 1 and 3, University Acres.

The opinion below made reference to the fact that Lots 1, 2 and 3 University Acres had all been sold whereas the lots in The Cedars Subdivision which were substituted for Lots 1 and 3, University Acres remain unsold, thus indicating that The Cedars property was less salable because of the absence of the improvements referred to in the appraisal. But the fact that the property was less readily salable, does not necessarily mean that the terms of the substitution clause were not met since the only requirement is that the average appraised value be a certain amount. It may be that the return on the investment by the bankrupt would have been maximized by first undertaking the improvements referred to; but the property nevertheless has an appraised value without such improvements being made and this value was greater than that of Lots 1 and 3, University Acres.

The bondholders argue that subtracting the cost of the improvements from the appraisal by Mr. Clement would not reflect the actual market value of The Cedars property at the time of substitution. According to this argument, the appraisal of the property reflected the increase in value which these lots would realize as a result of making the stated improvements, and any such increase in value would have to exceed the actual cost of the improvements if it were to justify itself financially. Thus say the bondholders, the actual value of the property is less than the appraisal minus the cost of improvements. This argument is correct only as far as it goes. If the property were sold to buyers who wanted it for purposes not requiring the improvements, the actual value of the prop-

7. Perhaps a more accurate method of taking account of the $46,167 estimated cost of improvements would be to subtract it only from the appraisal of Mr. Clements since only his estimate was based on the assumption that the property would be improved. This would reduce Mr. Clements' appraisal from $275,625 to $229,458 and make the average appraised value of The Cedars $266,309 which is over $27,000 greater than the stated values of Lots 1 and 3, University Acres.

erty could not be derived by subtracting the cost of the improvements from the estimated value. But for a buyer who was willing to make the stated improvements, subtracting the cost of the improvements would fairly reflect the value of the property according to the appraisal. Presumably the market for this property includes buyers willing to make such improvements since Mr. Clements' letter of July, 1971 stated that the value of the property could best be realized through the expenditure of additional funds to develop the land for apartments or as an extension of a shopping center.

As an additional basis in support of the position that the terms of substitution clause had not been complied with, the bondholders have argued that the requirement that the appraisals of the substituted property be made by National Bank and Trust and Citizens Bank and Trust was not adhered to in this case. In the Referee's opinion, reference was made to certain "significant" factors surrounding the appraisals, but it does not appear that he relied on these factors in finding that there had not been strict compliance with the substitution clause. Rather the Referee seemingly relied only on the fact that one of the appraisals was based on certain assumption in reaching his decision that there had not been lawful compliance with the clause. For this reason, this court need not decide whether the appraisals were made by the banks as required in the substitution clause. In addition, this court declines to rule on the other issues presented in the petitions for review, and remands this case to the Referee for reconsideration in light of the aforementioned conclusion that the values expressed in the appraisals relied on by the trustees in substituting Lots I, J and K of The Cedars for Lots 1 and 3, University Acres complied with the requirement contained in the substitution clause of the May 1, 1969 deed of trust.

It is so ordered.